UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| VERDE MINERALS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:16-CV-463 |
| | § | |
| BURLINGTON RESOURCES OIL AND | § | |
| GAS COMPANY, LP, *et al*, | § | |
| | § | |
| Defendants. | § | |

### ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
### AND MOTION FOR LEAVE TO AMEND

Plaintiff Verde Minerals, LLC (Verde) brings this putative class action on behalf of an alleged class of holders of oil and gas interests in approximately 2,092 acres (the Property) located in Live Oak County, Texas. Verde claims that Defendants 1893 Oil & Gas, Ltd. (1893) and ELP2 Minerals, Ltd. (ELP2) have violated obligations that their predecessor-in-interest assumed nearly a century ago when he agreed to pay a portion of any oil and gas proceeds derived from the Property to the predecessors-in-interest of Verde and other similarly situated parties.

The parties have filed cross-motions for summary judgment.[1] For the reasons that follow, Defendants' motion for summary judgment (D.E. 58) is **DENIED**. Verde's motion for partial summary judgment (D.E. 57) is **GRANTED IN PART AND DENIED IN PART**.

---

[1] Under the governing scheduling order (D.E. 50), the pending motions are "initial motions for summary judgment on issues regarding liability claims of named plaintiff" Verde. As such, the scope of this Order is restricted to the viability of claims asserted by Verde and assumes Verde can establish chain of title, an issue the parties have not yet addressed. The viability of claims that may be held by the other putative class members, as well as issues of class certification and representation, will be decided at a later date.

Verde also seeks leave under Rule 15(a)(2) to amend its complaint. That motion (D.E. 67) is **GRANTED**.

## FACTS

### A. Conveyance from the Green Owners to Plympton

Verde alleges that its interest stems from a series of grants by Edward Mattison (the Mattison Deeds), executed between 1919 and 1921 and filed in the Live Oak County records.[2] To determine the interest therein conveyed, however, it is necessary to review the series of transfers that preceded those from which Verde's claims arise.

The story begins in 1906 with the sale of approximately 47,000 acres, including the Property, from The Live Oak Company to four Texans, William Green, R.S. Dilworth, S.V. Houston, and Philip Welhausen (together, the Green Owners). This land was formerly known as the Fant Ranch.

Six years later, the Green Owners conveyed approximately 16,000 acres from their purchase, including the Property, to Ethel L. Plympton of Minneapolis, Minnesota. The sale was memorialized in a 1912 deed (the Plympton Deed), in which Ms. Plympton agreed to pay for the property with a cash down payment and "thirty-five (35) promissory Vendor's Lien Notes," of varying principal amounts and maturities. D.E. 58-3.

Rather than treating each note as an encumbrance on a particular portion of the property, the Plympton Deed provided that "[s]aid notes are secured by a Vendor's Lien on *all* of the land herein conveyed," with the noteholders free to accelerate the debt upon

---

[2] Verde alleges that the putative class members' interests arise from other contemporaneous transfers from Mattison to the class members' predecessors-in-interest pursuant to instruments that are substantially identical to the Mattison Deeds.

default. D.E. 58-3, p. 1–2 (emphasis added). However, a provision of the Plympton Deed (the Lien Release Clause) also gave Ms. Plympton and her successors an open-ended option to pay cash to the Green Owners in exchange for the release of Ms. Plympton's selected portions of the property from the vendors' lien. As will be seen, Ms. Plympton and/or her successors appear to have taken advantage of the Lien Release Clause, as the record reflects that portions of the 16,000-acre estate were later released from the vendors' lien.

**B. Conveyance from Plympton to USIR and from USIR to Mattison**

In 1914, Ms. Plympton sold the entirety of her 16,000 acres to the United States Installment Realty Company (USIR) of Minneapolis and its trustee, C.W. Reynolds.[3] D.E. 58-5. That deed expressly authorized USIR and Reynolds to subdivide the land, construct roads, and sell or encumber the land however Reynolds saw fit.

As reflected in subsequent conveyances, USIR subdivided the property into numbered tracts, most of which contained around twenty acres. Thus, where the Plympton Deed had described the property that Ms. Plympton bought by reference to the land's physical features (e.g., "a Mesquite, 8 inches in diameter, marked X"), the next series of relevant conveyances would describe the conveyed estate by reference to USIR's tract-numbering system.

One such conveyance was the 1917 deed in which USIR "obligate[d] itself to convey or have conveyed" the 2,092-acre Property to Mattison (the USIR-Mattison Deed). D.E. 58-9. That instrument identified the subject property as 102 tracts,

---

[3] Ms. Plympton's original purchase appears to have been a joint venture with the USIR, as the Plympton Deed refers to the notes as having been executed by Ms. Plympton and USIR.

numbered between Tract #48 and #248, non-inclusive, located within "Block Sixteen (16) Live Bee Land Subdivision Number Four (4)." *Id.*

The USIR-Mattison Deed also marked the first time that the parties to the conveyance expressly addressed oil and gas rights on the Property, with USIR reserving to itself "one-fourth of any and all oil, gas, or minerals . . . that may be in or upon said land." *Id.* at 2. Mattison was otherwise granted the right to develop the Property for purposes of oil and gas production.

By this time, the Green Owners had assigned seven of the 35 promissory notes referenced in the Plympton Deed to the Aetna Life Insurance Company (Aetna). D.E. 58-4. Through a series of releases, executed between 1912 and 1920, the Green Owners and Aetna jointly acknowledged the release from the vendors' lien of portions of the 16,000-acre estate. The record contains fifteen such instruments, which released from the vendors' lien 86 tracts within Block 16 of Live Bee Land Subdivision Number 4.[4] *See* D.E. 64-1 *through* D.E. 64-15. Some of the tracts so released were among those purchased by Mattison. The tracts purchased by Mattison, then, were not all on equal footing: some had been released from the vendors' lien and some had not.

### C. Conveyances to Messrs. Becken and West

Mattison subdivided the tracts covered by the USIR-Mattison Deed into acre-sized plots for resale. Verde alleges that it is successor-in-interest to three Minnesotans, Ole P. Becken, Hans P. Becken, and O.O. West, who purchased land from Mattison's grant, either directly from Mattison or through an intermediary who bought from Mattison, one

---

[4] The releases also encompassed the release of three tracts within Block 15, a different block in the Live Bee Land Subdivision. D.E. 64-11.

Richard Canning.  Between them, Messrs. Becken and West purchased approximately 13 of Mattison's 2,092 acres, scattered over seven of Mattison's 102 tracts.[5]  These transfers were memorialized in the Mattison Deeds, which are substantially identical except with regard to the parties, date, and covered property.

The parties dispute whether the Mattison Deeds conveyed any legally recognized interest.  By their terms, however, the Mattison Deeds contemplated a grant of both (1) a small surface estate, as identified by tract and acre number from the "Edward Mattison Survey"; and (2) a proportionate share of half of any oil and gas proceeds derived from anywhere within the 2,092 acres, with the proportion set by reference to the acreage purchased out of the whole.

For instance, the first sentence of the June 3, 1920 deed from Mattison to Ole P. Becken said that it conveyed:

---

[5]  The transfers to which Verde traces its interest may be summarized as follows:

| Grantor | Grantee | Date | Tract | Acre(s) |
|---|---|---|---|---|
| Edward Mattison | O.O. West | July 9, 1919 | 133 | 12, 13 |
| Edward Mattison | O.O. West | December 5, 1919 | 133 | 8, 9 |
| Edward Mattison | O.P. Becken | June 3, 1920 | 48 | One half acre east one half number 29 |
| Richard Canning | O.P. Becken and H.P. Becken | June 17, 1921 | 68 | 7 |
| | | | 98 | 14, 15 |
| | | | 208 | 13 |
| | | | 214 | Northwest quarter Acre 2 |
| | | | 231 | 11, 12, 13, 14 |

> [1] All that certain land and real estate situate[d] in the County of Live Oak, State of Texas, described as follows, to wit ***One Half Acre*** East One Half Number twenty nine Tract 48 being a part of the Edward Mattison Survey of 2,092.08 acres of land out of Block Sixteen (16), of Live Bee Land Subdivision No. 4, according to the map or plat of said Live Bee Land Subdivision No. 4 on file and of record in the officer of the Clerk of the County Court and Recorder of said Live Oak County, Texas, and original a part of the Festus Doyle Survey No. 4 in said County; ***and [2] such an undivided interest in an undivided one-half of any and all oil, gas or minerals that may be found to be in, under or upon any part of said tract of 2,092 acres*** described in the Edward Mattison Survey of a portion of said Block 16 ***as the number of acres purchased by said Ole P. Becken bears to the entire number of acres in said tract.***

D.E. 58-1 (emphasis added). Thus, in addition to granting surface rights to a specific half acre of land, this instrument purported to transfer an interest equivalent to 0.5 / 2,092 (i.e., the "portion of . . . the number of acres purchased by said Ole P. Becken . . . to the entire number of acres in said tract") of half of any future oil and gas proceeds Mattison received from the Property.[6] There is no provision that restricts the right to a share of the proceeds to only those grantees whose acre- or partial acre-sized portions of the land actually produced the oil or gas. Instead, purchasers of any part of the Property could claim a share of any oil and gas proceeds, no matter where within the Property oil or gas might be found.

### D. *USIR v. Mattison*, *Green v. Plympton,* and the USIR Bankruptcy

This series of transfers gave way to litigation in the early 1920s, as various parties holding interests in the development failed to meet their payment obligations. First, in

---

[6] The instrument does not specify that this grant is further subject to the 1/4 reservation from the USIR to Mattison grant. In fact, there is no indication from the instrument that Mattison held anything less than fee simple to the Property.

1921, USIR filed suit in Live Oak County against Mattison and one of his partners, alleging that Mattison failed to pay the balance due on the Property. D.E. 58-15. In its pleading, USIR listed the tracts Mattison had purchased and alleged that 51 of those tracts, which were also listed, remained subject to the vendors' lien. Notably, none of the seven tracts in which the approximately 13 acres conveyed by the Mattison Deeds were located—tracts 48, 68, 98, 133, 208, 214, and 231—was among those USIR identified as still subject to a vendor's lien. The implication from USIR's pleading, then, is that by that point, the vendors' lien had been extinguished from the seven tracts in which the acres covered by the Mattison Deeds were situated.

USIR's case against Mattison was ultimately dismissed for lack of prosecution. D.E. 58-15, p. 15. Meanwhile, in October 1923, the Green Owners sued Ms. Plympton, USIR, and USIR's trustee Reynolds in Live Oak County for the unpaid balance of the promissory notes from the 1912 conveyance. D.E. 58-16. As had USIR, the Green Owners acknowledged in their pleading that certain tracts that had formerly been subject to the vendors' lien "have been expressly released by plaintiffs from the operation of said vendor's lien." *Id.* at 6. The Green Owners then listed various tracts from Blocks 14, 15, and 16 that had been so released. Consistent with the *USIR v. Mattison* pleading, the list of released tracts included each of the seven tracts that encompassed the acreage purchased by Messrs. Becken and West.

While the Green Owners' suit against it was pending, USIR declared bankruptcy in Minnesota. D.E. 58-21. In April 1924, the bankruptcy trustee transferred to the Green Owners the remainder of the approximately 16,000 acres conveyed by the Plympton

Deed, "saving and excepting therefrom all of those tracts of land which have been heretofore sold and conveyed by said Companies and released from the operation of the vendor's liens retained [by the Plympton Deed]." D.E. 58-22. The effect of this exception was to leave untouched by the bankruptcy any lands that had been previously released pursuant to the Lien Release Clause from the Plympton Deed. The Green Owners later voluntarily dismissed the *Green v. Plympton* matter. D.E. 58-16, p. 2.

### E. *Houston v. Stanford*

In 1926, the Green Owners brought a quiet title action in Live Oak County, naming as defendants a large group of purported holders of interests in the land that the Green Owners had previously conveyed to Ms. Plympton and USIR. D.E. 58-25. The named defendants included Mattison and Canning, as well as "the unknown heirs of each of said persons," but not Messrs. Becken and West. The Green Owners sought to clear their title through adverse possession.

In an affidavit, S.V. Houston, one of the Green Owners, swore that "Miss Plympton, nor anybody else, never did pay us for the land and we had to take it back for our debts. . . . We had previously released some of the land, and these companies, had some of that land on hand." D.E. 58-26, p. 2. Houston went on to describe USIR's bankruptcy, and how the bankruptcy trustee had given the Green Owners a deed that "conveyed back to us all lands which we had not released." *Id.*

None of the defendants appeared, and the court entered judgment in the Green Owners' favor. Specifically, the *Houston* judgment declared that "all right, title and interest of defendants and each of them in and to the said premises be cancelled and

removed as a cloud on the title of the Plaintiffs, and the Plaintiffs may have their writ of possession." D.E. 58-27.

## F. Later Developments

The chain of title from the Houston judgment to the present day is less controversial. After the *Houston* judgment, the Green Owners conveyed their interests in the Property to a George C. Vaughan over the period from 1928 to 1938. Through another series of conveyances, the Alamo Lumber Company (Alamo) came to acquire the interests that had been conveyed to Vaughan.

In 1943, Alamo sold a portion of the surface estate to an Amos Gates, reserving all oil and gas to itself. D.E. 58-38. In 1962, Alamo divided its retained mineral interest between an E.L. Powell, who received a 1/4 interest, and a Geo. C. Vaughan and Sons, Inc., which received a 3/4 interest. D.E. 58-39. 1893 eventually succeeded to the 3/4 interest granted to Geo. C. Vaughan and Sons, Inc., and ELP2 succeeded to the 1/4 interest granted to E.L. Powell. Since approximately 2010, oil and gas has been produced from the Property under oil and gas leases granted by 1893 and ELP2. It is undisputed that Verde has never received any of the proceeds from production on the Property.

## STANDARD OF REVIEW

Summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine dispute of material fact means that 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)).  Evidence must be viewed, and all justifiable inferences drawn, in favor of the party opposing the motion.  *Anderson*, 477 U.S. at 255.

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets that burden, the nonmoving party cannot avoid summary judgment by "rest[ing] on mere conclusory allegations or denials in its pleadings."  *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016) (quoting *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995)) (internal quotation mark omitted).  Instead, the nonmoving party must "identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim."  *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)) (internal quotation marks omitted).  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted."  *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

On cross-motions for summary judgment, the Court must "review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party."  *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

# DISCUSSION

## A. Statute of Frauds

Defendants first challenge the Mattison Deeds as incapable of conveying any legally recognized property interest. Specifically, Defendants argue that the Mattison Deeds failed to comply with the Statute of Frauds, and for that reason conveyed nothing.

Under Texas law, which controls in this diversity case, interests in oil and gas constitute real property and thus are subject to the Statute of Frauds. *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006). To comply with the Statute of Frauds, a conveyance of real property must be memorialized in a writing that "furnish[es] within itself, or by reference to some other existing writing, the means or data by which the land to be conveyed may be identified with reasonable certainty." *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972).

Each of the Mattison Deeds purported to convey acreage:

> being a part of the Edward Mattison Survey of 2,092.08 acres of land out of Block Sixteen (16) of Live Bee Land Subdivision No. 4, according to the map or plat of said Live Bee Land Subdivision No. 4 on file in the office of the Clerk of the County Court and Record of said Live Oak County, Texas, and originally part of the Festus Doyle Survey No. 4 in said County.

Defendants contend that this grant fails because it lacks any metes and bounds description or other means by which to identify the acreage purportedly conveyed. Defendants further submit that the conveyance cannot be saved by reference to any external document, as (1) there is no evidence that an "Edward Mattison Survey" ever existed, let alone existed at the time of the conveyances; and (2) there is similarly no

evidence that a "map or plat of said Live Bee Land Subdivision No. 4" was actually on file with the Live Oak County Clerk at the time of the conveyance. As "it is impossible to identify and locate each 'acre' purportedly conveyed out of each 'tract,'" Defendants argue, the Mattison Deeds were ineffective to convey any title. D.E. 58, pp. 25–26.

The Mattison Deeds do not attempt to identify the conveyed property within the four corners of the document, so the Court must look to other existing writings to see whether they bring the Mattison Deeds into compliance with the Statute of Frauds. This has been referred to as the "nucleus of description" theory, which provides that an instrument may satisfy the Statute of Frauds if it presents a sufficient "clue or key so that the land may be identified with reasonable certainty." *Gates v. Asher*, 280 S.W.2d 247, 248 (Tex. 1955); *see also Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 909 (Tex. 1982) (grant that "expressly directed [the court] to an instrument which contains an adequate legal description" complied with Statute of Frauds). Where possible, the instrument is to be "given a liberal construction in order that the conveyance may be upheld." *Gates*, 280 S.W.2d at 248; *see also Siegert v. Seneca Res. Corp.*, 28 S.W.3d 680, 683 (Tex. App.—Corpus Christi 2000, no pet.) (same).

Verde has not identified conclusive evidence that any document in the record is the "Edward Mattison Survey" that the Mattison Deeds reference. Instead, Verde points to a map bearing the title "Corrected Map Made for Edward Mattison" (the Corrected Mattison Map), which shows a plan for subdividing into acre-sized plots the tracts listed in the Mattison-USIR Deed. D.E. 58-13. The Corrected Mattison Map, which was dated

September 25, 1920, indicates that it was corrected from an earlier map by E.T. Abbott of Minneapolis that apparently was then on file with the Live Oak County Clerk.[7]

As Defendants note, the Statute of Frauds requires an instrument to contain a sufficient description of the property "within itself, or by reference to some other *existing* writing." *Morrow*, 477 S.W.2d at 539 (emphasis added). Here, three of the four deeds to which Verde has allegedly succeeded predate the Corrected Mattison Map. Thus, Defendants contend, the "Edward Mattison Survey" as used in the Mattison Deeds cannot refer to the Corrected Mattison Map.

The fact that there is no "Edward Mattison Survey" in the record, however, does not cause the Mattison Deeds to fail under the Statute of Frauds. As noted, the Mattison Deeds purported to convey both a surface estate and a share in half of the proceeds Mattison received for any oil and gas discovered within the approximately 2,092 acres comprising the Property. Verde seeks to recover its alleged share of any oil and gas proceeds, not rights to the surface estate. It is therefore unnecessary to pinpoint the particular surface acreage conveyed by each Mattison Deed, so long as the Mattison Deeds and the documents referenced therein provide sufficient means to determine with reasonable certainty the grantee's share of the oil and gas proceeds conveyed.

The Mattison Deeds' citation to "the map or plat of said Live Bee Land Subdivision No. 4" provides such a means. Specifically, the record contains a 1913 map prepared at the behest of USIR (the USIR Map) that shows Live Bee Land Subdivision

---

[7] The corrected map seems not to have differed materially from the uncorrected one. The corrected map says that it was "in accordance with" Abbott's original map, and the different surveyors seem to have varied only slightly in their calculations: Abbott apparently had Mattison holding 2,092.08 acres, the same figure as in the USIR-Mattison Deed, whereas the Corrected Mattison Map estimated that Mattison held approximately 2,100 acres.

No. 4 broken into tracts. D.E. 58-14. The only reasonable conclusion from the record is that the "tracts" Mattison agreed to purchase were those drawn by the USIR Map, the "clue or key" that will allow determination of Verde's alleged interest.

This approach finds support from other documents in the record, as other holders of interests in the Property similarly described their holdings by reference to numbered tracts. Each of the pleadings in the *USIR v. Mattison*, *Green v. Plympton*, and *Houston v. Stanford* cases, for example, describes the property at issue by reference to tracts. There is no suggestion that, for instance, tract 48 as used in the *Green v. Plympton* pleading is a different parcel of land than the parcel of land described as tract 48 in the Mattison Deeds.

Finally, Defendants' own expert's declaration belies their argument that the Mattison Deeds do not provide a sufficient means to identify the interests in oil and gas on the Property allegedly conveyed therein. As noted, in 1943, Defendants' predecessor Alamo conveyed to Amos Gates the surface estate of approximately 2,133 acres in Block 16 in Live Bee Land Subdivision Four. D.E. 58-38. The instrument memorializing the transfer described the conveyed estate by numbered tracts, many, though not all, of which appear to be the same numbered tracts as listed in the USIR-Mattison Deed. Defendants' proffered geoscientific expert has identified where on a modern-day map the tracts conveyed by the Alamo-to-Gates deed are located. *See* D.E. 58-46; D.E. 58-48. It would seem the same method could be used to identify the tracts conveyed by the USIR-Mattison Deed, which would be sufficient to determine the estate as to which Verde seeks to enforce its alleged rights.

As such, the Statute of Frauds does not negate the conveyance of a property interest to Verde's predecessors-in-interest.[8]

## B. Analysis of the Mattison Deeds

While the parties disagree what if any interest was created by the Mattison Deeds, they do not contend that the deeds are ambiguous. Under Texas law, the construction of an umambiguous deed is one of law for the Court. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). Thus, "the court's primary duty is to ascertain the intent of the parties from the language of the deed using the 'four corners' rule." *French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 796 (Tex. 1995). In construing the Mattison Deeds, the Court is mindful that Texas courts "have favored a holistic and harmonizing approach and rejected mechanical rules of construction, such as giving priority to certain types of clauses over others or requiring the use of magic words." *Hysaw v. Dawkins*, 483 S.W.3d 1, 8 (Tex. 2016).

The parties diverge widely on their views of the Mattison Deeds. Relying on Texas oil and gas precedents, Verde argues that the Mattison Deeds conveyed a share of ownership in the mineral interest of the Property, or in the alternative, a fixed royalty interest in any future oil and gas proceeds. Defendants, on the other hand, dispute both characterizations and instead construe the Mattison Deeds as at most creating an unenforceable personal covenant.

---

[8] Defendants make a similar argument under the principle of contract law that "[a] contract must be complete within itself in every material detail and must contain all the essential elements of the agreement." D.E. 58, p. 27. However, this argument fails because the essential term of the contract, that of the mineral interest in the Property, is described with sufficient particularity.

## 1. Mattison Conveyed a Royalty Interest, But Did Not Convey Rights to Bonus Payments and Delay Rentals

Verde's first contention is that the Mattison Deeds conveyed a mineral interest. "An instrument conveying land in fee simple transfers both the surface estate and all minerals and mineral rights, unless the instrument contains a reservation or expresses a contrary intention." *Hysaw*, 483 S.W.3d at 9. Five severable rights comprise the mineral estate: "(1) the right to develop; (2) the right to lease; (3) the right to receive bonus payments; (4) the right to receive delay rentals; and (5) the right to receive royalty payments." *Id.* (quoting *French*, 896 S.W.2d at 797) (internal quotation marks omitted).

If not a mineral interest, Verde argues, the Mattison Deeds at least conveyed a royalty interest. A royalty interest is "the right to receive, either in kind or its equivalent in money, a stipulated fraction of the oil and gas produced and saved . . . , free of all costs of development and production." *Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 351 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citation omitted). It "derives from the grantor's mineral interest and is a nonpossessory interest in minerals that may be separately alienated." *Hysaw*, 483 S.W.3d at 9. A single instrument may convey both "an undivided portion of the mineral estate and a separate royalty interest, and the royalty interest conveyed may be larger or smaller than the interest conveyed in the minerals in place." *Id.* "In this manner, hybrid interests can be created." *Reed v. Maltsberger/Storey Ranch, LLC*, 534 S.W.3d 51, 55 (Tex. App.—San Antonio 2017, pet. denied) (citation and internal quotation marks omitted).

Verde's claim that the instruments conveyed a mineral interest focuses on the second clause of the first sentence of the deed. That provision purported to convey:

> . . . such an undivided interest in an undivided one-half of any
> and all oil, gas or minerals that may be found to be in, under
> or upon any part of said tract of 2,092 acres described in the
> Edward Mattison Survey of a portion of said Block 16 as the
> number of acres purchased by said [grantee] bears to the
> entire number of acres in said tract.

D.E. 58-1. As Verde notes, the reference to "oil, gas or minerals that may be found to be

in, under, or upon" the land is reminiscent of the "in and under" formulation customarily

used to convey mineral interests. D.E. 57, p. 9 (quoting *Reed* 534 S.W.3d at 55).

It is also the case that "when an undivided mineral interest is conveyed, reserved,

or excepted, it is presumed that all attributes remain with the mineral interest unless a

contrary intent is expressed." *French*, 896 S.W.2d at 797 (quoting *Day & Co. v. Texland

Petroleum*, 786 S.W.2d 667, 669 n.1 (Tex. 1990) (internal quotation marks omitted)).

Thus, the fact that an instrument is silent as to some portions of the mineral estate, while

explicitly reserving other portions of the mineral estate to the grantor, ordinarily would

suggest that those unnamed interests were intended to be conveyed.

However, "[t]o discern intent, words and phrases must be construed together and

in context, not in isolation." *Hysaw*, 483 S.W.3d at 13. As such, the Court must consider

the entirety of the instrument to determine what the parties intended.

"A property owner's rights are often described as a bundle of rights, or a bundle of

sticks." *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 48 (Tex.

2017). Using the June 3, 1920 deed from Mattison to Ole P. Becken as an example, "a

careful and detailed examination of the document in its entirety" shows that it disposed of

portions of two related but distinct "bundles of sticks." *See Wenske v. Ealy*, 521 S.W.3d

791, 798 (Tex. 2017) (citation and internal quotation marks omitted). One "bundle of

sticks" was the small parcel of land purchased by Becken. The other "bundle of sticks" was the mineral estate corresponding to the approximately 2,092 acres of the Property. Though the instrument itself does not explicitly distinguish between these property interests, it is necessary to do so in order to discern the parties' intent.

Again using the June 3, 1920 deed from Mattison to Becken as an example, the first sentence of that instrument purported to convey both (1) "certain land and real estate," amounting to half an acre; and (2) "an undivided interest in an undivided one-half of any and all oil, gas or minerals that may be found to be in, under or upon any part of said tract of 2,092 acres."

The next sentence of the grant, which begins "It is hereby agreed . . . ," may be divided into four parts. Each of the first three parts of that sentence refers to "said land," thereby calling back to the grant of "certain land and real estate," i.e., the half-acre purchased by Becken. The language of the instrument is also clear that Mattison would retain the "ownership" of any oil, gas, or minerals "in, upon, or under said land," as well as the right to enter upon "said land" to extract any such oil, gas or minerals.

Specifically, the first three parts of the deed's second sentence provided as follows (numbering and emphasis added):

It is hereby agreed that:

(1)     the consideration paid for **said above described land** is in payment only for the ownership thereof, **exclusive of the ownership of any and all oil, gas, minerals, mineral oils, mineral paints, fossils or ores that may be in or upon said land**, except as an interest therein is granted in the grant of an undivided interest in one-half of the oil, gas, or minerals that may be found on the

2,092.08 acres in the said Edward Mattison Survey, and

(2)     that the ***ownership of all such oil, gas or minerals, mineral oils, mineral paints, fossils or ores that may be in, upon, or under said land*** is not sold, paid for, or conveyed to said second party, and that said ownership is retained by said first party and his grantors;

(3)     that said first party and his grantors also retain the right and are hereby, by the acceptance of this deed, authorized and empowered by said Ole P. Becken on behalf of himself, his heirs, executors, administrators and assigns, ***to enter upon said land***, and every part thereof, and to dig and bore on said land for such oil, gas or minerals; to remove and sell the same, and to lay pipe lines and to construct roads over and across said land for the purpose of removing therefrom any and all oil, gas or minerals that may be found thereon; . . .

D.E. 58-1. Each of these references to "said land," then, refers to the half-acre, and not the mineral estate of the entire Property. By repeating that Mattison retained "ownership" of any oil and gas under "said land," the effect of this conveyance was to grant Becken a surface estate, reserving to Mattison the right to enter the land as necessary to extract any oil and gas, also retained by Mattison, that might be underneath the half-acre.

By contrast, the fourth part of the second sentence of the instrument—which Defendants refer to as the "personal proceeds covenant"—does not address "said land" or any rights pertaining exclusively to the half-acre purchased by Mr. Becken. It instead refers to "said entire tract," thereby alluding to "said tract of 2,092 acres," i.e., the entire

Property.  It clarifies that the grantee's fractional share of any oil and gas proceeds was to be determined after deducting for operating expenses:

> [It is hereby agreed] that [Mattison] covenants on behalf of himself, his heirs, executors, administrators and assigns, that he will deliver and pay to said party of the second part; his heirs or assigns, such proportion of all moneys that may be received by him for one-half of all oil, gas or minerals that may be found by said first party **upon said entire tract** and sold by him, **after paying the expenses of refining, marketing, shipping, storing and other necessary expense on same**, as the number of acres conveyed to said party of the second part bears to the entire number of acres described in the plat of said Edward Mattison Survey, viz: 2,092.08 acres.

D.E. 58-1 (emphasis added).  In this portion of the deed, then, the acreage purchased by Mr. Becken is relevant only inasmuch as it determines his share of half of the oil and gas proceeds Mattison might receive from the entire Property.

Even though the first sentence speaks of conveying "an undivided interest" in the mineral estate of the Property, the effect of the rest of the deed was to clarify that the undivided interest was only an interest in any royalties produced from the Property.[9]  The rights to delay payments and bonuses, like the rights to develop and lease the Property, were therefore retained by Mattison.

Verde's argument that the Mattison Deeds conveyed mineral interests relies primarily on *Altman v. Blake*, 712 S.W.2d 117 (Tex. 1986) and *Delta Drilling Co. v. Simmons*, 338 S.W.2d 143 (Tex. 1960).  Verde characterizes these cases as holding that

---

[9]  The Court notes as well that the instrument is silent as to production costs, which are "the expenses incurred in exploring for mineral substances and in bringing them to the surface."  *Cartwright v. Cologne Prod. Co.*, 182 S.W.3d 438, 444 (Tex. App.—Corpus Christi 2006, pet. denied).  This is consistent with the principle that holders of royalty interests usually are not required to bear such costs.  *See id.* ("Absent an express term to the contrary, [production] costs are not chargeable to the non-operating royalty interest.").

the relevant conveyances "were intended to be mineral interests that included all of the essential mineral rights other than those that were expressly reserved." D.E. 57, p. 16.

Neither *Altman* nor *Delta Drilling*, however, involved a conveyance such as this one. The conveyances in *Altman* and *Delta Drilling* granted an undivided interest in a mineral estate that was then ***reduced*** by rights that were expressly withheld by the grantor. In *Altman*, for instance, the relevant deed purported to convey an undivided interest in the relevant mineral estate, then withheld to the grantor leasing rights and the right to receive delay rentals. 712 S.W.2d at 118. The *Altman* court considered the deed before it to be indistinguishable from the instrument in *Delta Drilling*, which the *Altman* opinion cited for the proposition that "a mineral interest shorn of the executive right and the right to receive delay rentals remains an interest in the mineral fee."[10] *Id.* at 118–19, 120 (citing *Delta Drilling*, 338 S.W.2d at 143).

Like the conveyances in *Altman* and *Delta Drilling*, there is language in the Mattison Deeds that suggests the grant of an undivided interest in a mineral estate—that of the Property. But rather than ***reducing*** that grant by expressly withholding to Mattison selected components of the relevant mineral estate, the next portion of the instrument to address the mineral estate of the Property—the fourth section of the second sentence— ***clarified*** the nature of the "undivided interest" that was conveyed. It specified that the interest that the grantee received was in fact an interest in oil and gas proceeds. Whereas the instruments in *Altman* and *Delta Drilling* conveyed a full mineral interest and then removed particular sticks from the mineral estate bundle, here, the Mattison Deeds

---

[10] The "executive right" refers to the right to lease. *Altman*, 712 S.W.2d at 118.

conveyed a single stick, and then, later in the conveyance, ***described*** the precise nature of the stick that had been conveyed.

Instead of *Altman* or *Delta Drilling*, this case is closer to *Lyle*, which concerned an assignment of an oil and gas lease from Japhet, the assignor, to Humble Oil, the assignee. In *Lyle*, the instrument stated that "[i]n further consideration of this transfer [Humble Oil] further agrees to carry [Dan A. Japhet et al.] for a working interest of one-fourth (1/4) of the net money profit realized by it from its operations upon said tracts of land, accountings to be had monthly once profits begin to accrue."  365 S.W.3d at 346. Elsewhere, the instrument noted that the transfer was subject to "the royalties herein reserved to assignors," but the critical portion of the assignment—the assignee's "agree[ment] to carry [the assignor] for a working interest of one-fourth (1/4) of the net money profit realized"—was not labeled a "royalty."  The *Lyle* court nonetheless concluded that the instrument reserved to Japhet his proportionate share of a "one-fourth royalty interest in the profits realized from Humble Oil's operations on the lease."[11]  *Id.* at 352.

Similarly, the instruments here conveyed to Mattison's grantees a pro rata portion of "all moneys that may be received by [Mattison] for one-half of all oil, gas or minerals that may be found by [Mattison] upon said entire tract and sold by him, after paying the expenses of refining, marketing, shipping, storing and other necessary expense on same." As Defendants note, the word "royalty" does not appear in the instrument.  But there are

---

[11]  Before assigning the lease to Humble Oil, Japhet had assigned 8/60 of his interest to other parties, so the precise royalty reserved in the Humble Oil assignment was "52/60 of the one-fourth royalty interest in the profits realized from Humble Oil's operations on the lease."  *Lyle*, 365 S.W.3d at 352.

no "magic words" that are necessary to create a royalty interest. *Hysaw*, 483 S.W.3d at 8. Moreover, a promise to pay a "proportion of all moneys that may be received . . . for one-half of all oil, gas or minerals that may be found by said first party" is equally descriptive of a royalty interest as an agreement "to carry [grantor] for a working interest." *Lyle*, 365 S.W.3d at 346. The unambiguous terms of the Mattison Deeds, then, reflect the parties' intent to convey a royalty interest.

### 2. The Royalty Interest Conveyed Was a Floating Royalty Interest

Having determined that Mattison conveyed only a royalty interest, the Court must next determine the nature of the royalty interest that was conveyed.

"Royalty interests may be conveyed or reserved 'as a fixed fraction of total production' (fractional royalty interest) or 'as a fraction of the total royalty interest' (fraction of royalty interest)." *Hysaw*, 483 S.W.3d at 9 (quoting *Luckel*, 819 S.W.2d at 464). A "fraction of royalty interest" is also referred to as a "floating" royalty. *See id.* at 4; *see also Graham v. Prochaska*, 429 S.W.3d 650, 657 (Tex. App.—San Antonio 2013, pet. denied) ("[T]he value of the royalty interest 'floats' in accordance with the size of the landowner's royalty.").

Contrary to Verde's contention, it is clear that the parties contemplated a floating, rather than a fixed, royalty interest. Mattison's grantees were not entitled to a fixed fraction of any oil and gas production derived from the Property. Instead, they were entitled to a fraction of half of whatever proceeds Mattison received from the Property (an interest that was itself subject to USIR's reservation of one-fourth of oil and gas rights). Mattison's grantees' interests would fluctuate, or float, based on whatever

royalties Mattison might negotiate for himself under any future leases. *See Hysaw*, 483 S.W.3d at 9 (floating royalty interest "varies in accordance with the size of the landowner's royalty in a mineral lease" (citation omitted)).

The conclusion that the instruments contemplated a floating royalty interest also addresses another of Defendants' arguments as to why the deeds should not be construed as conveying a mineral or royalty interest. They argue that, if the Mattison Deeds conveyed a mineral or royalty interest, there would have been no need to include the "personal proceeds covenant" because, as a matter of law, the grantees, as holders of royalty interests, would have been entitled to a share of the proceeds.

The "personal proceeds covenant," however, clarified that the "undivided interest" received by the grantee was a floating, rather than a fixed, royalty interest, and thus would vary based on what Mattison received for the minerals at issue. Rather than surplusage, it provides an important qualification on the interest conferred to Mattison's grantees.

### 3. The Mattison Deeds Do Not Contain an Unenforceable Personal Covenant

Defendants construe the grants as containing, at most, an unenforceable personal covenant on behalf of Mattison. The Court disagrees.[12]

As a preliminary matter, the Court does not attach much significance to the fact that the Mattison Deeds used the term "covenant" in the portion of the instrument describing the royalty interest. Such language seems unremarkable in early-twentieth

---

[12] Defendants note that Verde pleaded its cause of action as one for breach of covenant. However, "the formal issues framed by the pleadings are not controlling on a motion for summary judgment." 10A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2721 (4th ed.).

century conveyances of oil and gas interests. *See, e.g.*, *Phillips Petroleum Co. v. Williams*, 158 F.2d 723, 724 n.2 (5th Cir. 1946) (lessee "covenants and agrees . . . [t]o pay lessor for gas produced from any oil well . . . ."); *Sheffield v. Hogg*, 77 S.W.2d 1021, 1023 (Tex. 1934) ("lessee covenants and agrees . . . ."); *Southland Royalty Co. v. Pan Am. Petroleum Corp.*, 378 S.W.2d 50, 52 (Tex. 1964) (same).

Moreover, whether the instrument is framed as a conveyance of a royalty interest or as a covenant running with the land does not impact Verde's right to recovery. A covenant will run with the land "when it [1] touches and concerns the land; [2] relates to a thing in existence or specifically binds the parties and their assigns; [3] is intended by the original parties to run with the land; and [4] when the successor to the burden has notice." *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987). Contrary to Defendants' assertions, the Mattison Deeds contemplated the conveyance of an interest in real property—a fraction of the royalty interest in the mineral estate of the Property—and thus satisfied the requirement that the covenant be memorialized in a transfer of property.[13]

As for the "touch and concern" element, it has been characterized as a requirement that the promise "affect[] the nature, quality or value of the thing demised, independently of collateral circumstances, or . . . the mode of enjoying" the property. *See Westland Oil Dev. Corp.*, 637 S.W.2d at 911 (citation omitted). The transfers at issue meet that test. Again, *Lyle* is instructive: in addition to holding that the instrument reserved in the assignor a royalty of "one-fourth of the profit realized," the *Lyle* court held that "[t]he

---

[13]  For this reason, privity of estate also existed between Mattison and his grantees. *Westland Oil Dev. Corp.*, 637 S.W.2d at 910–11.

covenant to pay a one-fourth royalty also clearly touches and concerns the land as it affects the value of the lease." 365 S.W.3d at 353; *see also Westland Oil Dev. Corp.*, 637 S.W.2d at 910 ("contract to convey interests in oil and gas leases . . . . involved covenants running with the land").

Defendants direct the Court to the provision in the deeds obligating Mattison to pay to the grantees "such proportion of all monies that may be received ***by him*** for ½ of all oil, gas, or minerals that may be found . . . upon said entire tract and sold ***by him***." D.E. 58, p. 30. They claim the repeated references to "him"—Mattison—illustrate that the parties did not intend the payment obligation to survive Mattison's personal interest.

This argument is unpersuasive. In the deed, Mattison "covenant[ed] on behalf of himself, his heirs, executors, administrators and assigns" to make the payments that Verde claims were improperly withheld. If the payment obligation had been limited to the oil and gas proceeds that Mattison himself personally received, it would have made no sense for the instrument to state that the obligation would be binding on Mattison's successors. The implication from the deed in its entirety, then, is that the deed obligated Mattison, "his heirs, executors, administrators and assigns" to pay to their grantees "such proportion of all monies that may be received ***by Mattison, his heirs, executors, administrators and assigns***."

Defendants also rely on *In re Sabine Oil & Gas Corp.*, 550 B.R. 59 (Bankr. S.D.N.Y. 2016) to argue that the payment proceeds covenant is unenforceable. The agreements at issue in that case, however, concerned the delivery and refinement of resources extracted from real property, along with ancillary obligations such as

constructing a pipeline system and meeting minimum supply commitments. As the court noted, "[a] right to transport or gather produced gas is clearly not one of the[] 'sticks'" comprising the mineral estate. *Id.* at 80. Here, by contrast, the parties intended to convey an interest in oil and gas.[14] *Sabine Oil* is inapposite.

Finally, Defendants cite a number of cases that they submit are examples of analogous "personal" covenants that are unenforceable against anyone other than the original promisor. These cases, however, involve promises unlike those at issue. For instance, *Blasser v. Cass*, 314 S.W.2d 807 (Tex. 1958), held that a property owner's covenant to pay commissions to his real estate broker for any future lease renewals was unenforceable against later buyers of the property. Likewise, *Wayne Harwell Properties v. Pan American Logistics Center, Inc.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997, writ. denied), rejected a claim based on a covenant to pay a portion of the "net cash flow interest" on land slated for foreign trade zone and warehouse development. Unlike the covenants at issue in these cases, the Mattison Deeds contemplated the conveyance of an interest that Texas law recognizes as an interest in real property. These cases therefore are unpersuasive.

---

[14] Defendants further argue that because the deeds allow Mattison to pay his grantees after paying the expenses of refining, marketing, and so on, the deeds contemplate payment for "substances which have been separated from real property" and thus there is no conveyance of a real property interest. D.E. 58, p. 33. But in *Lyle*, the grantor reserved a fraction of the "net money profit realized" from the grantee's operations. 365 S.W.3d at 346. The Court sees no distinction between obligations to pay a share of the "net money profit realized" and "moneys that may be received." *See also Cartwright*, 182 S.W.3d at 444–45 (noting that post-production costs, "includ[ing] taxes, treatment costs to render the gas marketable, compression costs to make it deliverable into a purchaser's pipeline, and transportation costs," "are normally proportionately borne by both the operator and the royalty interest owners").

## C.  The Deeds Do Not Violate the Rule Against Perpetuities

Defendants' final challenge to the facial validity of the Mattison Deeds falls under the rule against perpetuities.  This challenge also fails.

The Texas constitution provides that "Perpetuities . . . are contrary to the genius of free government, and shall never be allowed."  Tex. Const. art. I, § 26.  To implement this prohibition, the Texas courts have adopted the rule that "no interest is valid unless it must vest, if at all, within twenty-one years after the death of some life or lives in being at the time of the conveyance."  *ConocoPhillips Co. v. Koopman*, 547 S.W.3d 858, 867 (Tex. 2018).  If an instrument is equally susceptible to multiple interpretations, the Court is to adopt the construction that will not run afoul of the rule.  *Id.*

It appears that many decades passed before any oil or gas was removed from the Property and marketed.  Defendants thus characterize the interests conveyed by the Mattison Deeds as invalid springing executory interests that might not, and in fact did not, vest within twenty-one years of anyone alive at the time of the conveyance.

Interests in royalties from oil and gas production, like any other interests, are subject to the rule.  *Luecke v. Wallace*, 951 S.W.2d 267, 273 (Tex. App.—Austin 1997, no writ).  However, the fact that Mattison's grantees might have to wait many years before seeing any return on their investment does not cause the instruments to fail under the rule.  "By definition, a royalty interest is an interest in a share of the future product or profit from an oil and gas lease."  *Id.* at 274.  As such, "neither oil and gas production nor the existence of an oil and gas lease are necessary for a royalty interest to be a vested, present interest (i.e., a fee simple interest in royalties)."  *Id.*; *see also Haywood WI Units,*

*Ltd. v. B&S Dunagan Investments, Ltd.*, No. 13-15-00454-CV, 2017 WL 6379737, at *4 (Tex. App.—Corpus Christi Dec. 14, 2017, pet. denied) (interest in a share of future mineral production was a "vested, present interest").

The cases Defendants cite are easily distinguishable. *Peveto v. Starkey*, 645 S.W.2d 770, 771 (Tex. 1982), for instance, concerned a deed that purported to grant Starkey a royalty interest that would only become effective upon the expiration of the royalty interest that had previously been conveyed to Peveto, which itself would continue so long as oil and gas production continued on the property. Here, the Mattison Deeds did not defer the effective date of the conveyed interests until after the expiration of some other, earlier-conveyed royalty interest. As for *ConocoPhillips*, that decision held that a reservation in an oil and gas conveyance, which would admittedly have been voided under a strict application of the common law rule against perpetuities, was nonetheless enforceable. 547 S.W.3d at 868, 873. *ConocoPhillips*, then, represents a relaxation of the rule in the oil and gas context, where the typical justifications for the rule—"restraint on alienability and promoting the productivity of land"—are not at issue. *Id.* at 869.

For these reasons, the Mattison Deeds therefore did not violate the rule against perpetuities.

### D. The Vendors' Lien Did Not Void the Mattison Grantees' Interests

Defendants next contend that Verde cannot succeed to any interest conveyed to Mattison's grantees by operation of the vendors' lien established by the Plympton Deed. They argue that under the terms of the Plympton Deed, the full fee simple estate would not be conveyed until the vendors' lien was satisfied in its entirety, and as the vendors'

lien was never fully paid, whatever interests Mattison attempted to convey were reclaimed by the Green Owners when they enforced their vendors' lien in the USIR bankruptcy.

Defendants' "delayed conveyance" theory focuses on the last paragraph of the Plympton Deed, which they describe as "a requirement for the parties to extinguish **all** promissory notes before title in the property became absolute." D.E. 58, p. 12. That provision states as follows:

> But it is expressly agreed and stipulated that the vendor's lien is retained against the above described property, premises and improvements*, until the above described notes, and all interest thereon, are fully paid*, according to their face and tenor, effect and reading, ***when this deed shall become absolute.***

D.E. 58-3, p. 5 (emphasis added).

This provision is somewhat in tension with the Lien Release Clause, which, as noted above, allowed for portions of the conveyed premises to be freed from the vendors' lien before the notes were all paid in full. The Lien Release Clause, which immediately preceded the last paragraph of the Plympton Deed, provides:

> The grantee herein, her heirs or assigns, shall, upon request, receive from the grantors herein, a release from the vendor's lien retained by said grantors herein of any portion of said lands selected by her at the rate of one acre for each $20.00 paid on account of the purchase price, but no release shall be for less than 20 acres.

*Id.* Defendants ask the Court to resolve the tension by deciding that the Lien Release Clause is "subordinate and subject to" the final paragraph of the Plympton Deed. D.E.

58, p. 38. If so, they argue, title never fully vested in Ms. Plympton or any of her successors, rendering Mattison's grants void as well.

The text of the Plympton Deed forecloses Defendants' interpretation. It states just the opposite: that "[s]aid notes are secured by a vendor's lien on all of the land herein conveyed, and *are subject to the partial payment and release clause hereinafter mentioned*." D.E. 58-3, pp. 1–2 (emphasis added). If the notes were subject to the Lien Release Clause, then releasing tracts of land from the vendors' lien extinguished any interest the Green Owners previously held in those tracts.

Moreover, Defendants' proposed reading would render the Lien Release Clause a nullity. The $20-per-acre option in the Lien Release Clause represents a substantial premium over Ms. Plympton's purchase price of roughly $16 per acre. The benefit to be gained from invoking the Lien Release Clause was to purchase freedom for that tract from the vendors' lien. Otherwise, Ms. Plympton would have had no reason ever to invoke the Lien Release Clause. Defendants offer no explanation as to what purpose the Lien Release Clause served under their interpretation.

Although the Court need not consider extrinsic evidence to decide the question, it is nonetheless noteworthy that the Green Owners appear not to have construed the deed in the manner urged by Defendants. In their 1923 suit against Ms. Plympton and USIR, the Green Owners sought to foreclose on the property based on the unpaid balance of the promissory notes from the Plympton Deed. The Green Owners' pleading in that case, however, acknowledged "that said vendor's lien securing payment of said notes should remain and continue in full force . . . , *excepting from the operation of said agreement*

***all lots or parcels of land theretofore released from the operation of said vendor's lien by plaintiffs***." D.E. 58-16, p. 6 (emphasis added). The Green Owners' pleading went on to list dozens of tracts that had been so released, including all seven of the tracts in which the acreage purchased by Messrs. Becken and West is situated.

Had the Green Owners shared Defendants' view of the Plympton Deed, they would have had no reason to distinguish between parcels that had been released from the vendors' lien and those that had not. They instead would have sought to recover all of the land they sold to Ms. Plympton, on the theory that they retained superior title until the notes were fully paid. The fact that they did not only reinforces the conclusion that the Lien Release Clause was not subordinate to the Plympton Deed's final paragraph.[15]

Defendants' predecessors placed great significance on the distinction between tracts released from the vendors' lien and those that were not, as seen by the fact that that distinction was observed over the succession of controversies in the early 1920s. Now, Defendants seek to elide that distinction in a manner inconsistent with both the text of the Plympton Deed and Defendants' predecessors' actions. In sum, the Green Owners' efforts to foreclose on their vendors' lien did not void the conveyances to Mattison's grantees. Defendants' motion for summary judgment on this point is therefore denied.

---

[15] Defendants also cite *Talley v. Howsley*, 170 S.W.2d 240 (Tex. Civ. App.—Eastland 1943), *aff'd*, 142 Tex. 81 (1943), for the proposition that a covenant is "coextensive only with the estate to which it is annexed" and "is extinguished when the estate ceases." The distinction between *Talley* and the present case, however, is that in this case, parts of the estate subjected to the encumbrance were released before the foreclosure.

### E. Defendants Did Not Acquire Title Through Adverse Possession

Defendants next argue that any interest Verde and its predecessors may have held has since been acquired by adverse possession.  Their arguments are unavailing.

#### 1. *Houston v. Stanford*

Defendants' first argument rests on the effect of the 1927 judgment in *Houston v. Stanford*, which conveyed to the Green Owners "all right, title and interest of defendants and each of them in and to the said premises be cancelled and removed as a cloud on the title of the Plaintiffs, and the Plaintiffs may have their writ of possession."  D.E. 58-27.  Defendants contend this judgment left the Green Owners as owners in fee simple of the Property and its associated mineral estate.

By the time of the *Houston v. Stanford* litigation, however, the mineral estate of the Property had been severed from the surface estate.  It has long been settled Texas law that "after the mineral and surface estate have been severed, an adverse possessor of the surface estate cannot accomplish adverse possession of the mineral estate unless he takes actual possession of minerals under the surface by drilling and producing them for the statutorily-described period."  *Sarandos v. Blanton*, 25 S.W.3d 811, 815 (Tex. App.—Waco 2000, pet. denied); *see also Luse v. Parmer*, 221 S.W. 1031, 1032 (Tex. Civ. App.—El Paso 1920, writ refused) ("[O]rdinary possession of the surface to which he was entitled under his deeds, . . . would not defeat by limitation the title to the minerals . . . ."); *Green v. W. Tex. Coal Mining & Developing Co.*, 225 S.W. 548, 552 (Tex. Civ. App.—Austin 1920, writ ref'd) ("After the estate in the mineral has been severed by

grant, possession of the surface by the grantor is not possession of the mineral, and is therefore not adverse to the owner of the mineral.").

There is no suggestion that the Green Owners took actual possession of the minerals under the Property by drilling or producing them prior to *Houston v. Stanford*. As such, the *Houston v. Stanford* judgment was ineffective to convey title to the mineral rights held by Mattison. *See, e.g.*, *Sarados*, 25 S.W.3d at 813, 816 (state vacancy award purporting to convey both surface and mineral estates did not constitute possession of the mineral estate for purposes of establishing adverse possession); *see also Atl. Refining Co. v. Noel*, 443 S.W.2d 35, 41 (Tex. 1969) (cautioning against "a rule which would permit the acts of a surface owner to reduce the ownership of the mineral estate, even without notice or knowledge of the facts by the mineral owner").

For these reasons, the *Houston v. Stanford* judgment was insufficient to extinguish Mattison's grantees' royalty interest.

### 2. Adverse Possession Through Oil Production

Defendants also claim that they obtained title through oil production. This argument too is unavailing. It is undisputed that at least since 2007, Defendants, or their predecessors-in-interest, have been lessors of oil and gas interests. It is also undisputed that the relevant leases cover the tracts in which the acreage conveyed by the Mattison Deeds is situated.

"Under Texas law, adverse possession requires 'an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." *BP Am. Prod. Co. v.*

*Marshall*, 342 S.W.3d 59, 69 (Tex. 2011) (quoting Tex. Civ. Prac. & Rem. Code § 16.02(1)). "The 'possession must be of such character as to indicate *unmistakably* an assertion of a claim of exclusive ownership in the occupant.'" *Id.* at 70 (quoting *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990)).

In the oil and gas context, the Texas Supreme Court has repeatedly recognized that a lessee under an oil and gas lease may adversely possess the leasehold interest after the lease terminates. For instance, in *Natural Gas Pipeline Co. of America v. Pool*, 124 S.W.3d 188 (Tex. 2003), the leases at issue allegedly terminated due to a brief period of non-production, but the lessees continued to drill and produce oil and pay the lessors the negotiated royalties. Observing that "[o]nce the leases terminated, the lessees had no right to explore for, produce, or sell any of the oil and gas" on the property, the Texas Supreme Court held that continuing to produce oil and pay royalties was sufficiently "open, notorious, and hostile to the lessors" to establish adverse possession of the leasehold interest. *Id.* at 197. Similarly, *BP America Production Co. v. Marshall* held that even if a lessor and lessee became co-tenants upon expiration of a lease, the lessee's "payment of royalties—not a cotenant's share—to [lessor] for the entire time it operated on the lease was thus an unmistakable and hostile assertion of exclusive ownership of the leasehold." 342 S.W.3d at 71.

Thus, while a lessee's possible adverse possession of a leasehold estate is well-established, whether adverse possession defeats Verde's claim is a different matter. The record reflects that 1893 and ELP2 are presently lessors under oil and gas leases and that drilling and production have occurred on the Property since at least 2010. The mineral

leases on the Property, as is typical of oil and gas leases, convey all possessory rights to the lessees and retain in the lessors only a royalty interest with the possibility of reverter. *See Pool*, 124 S.W.3d at 192 ("When an oil and gas lease reserves only a royalty interest, the lessee acquires title to all of the oil and gas in place, and the lessor owns only a possibility of reverter and has the right to receive royalties."). Defendants have not cited a single case in which oil and gas lessors, as holders of non-possessory interests, successfully asserted an adverse possession defense against a claim for unpaid royalties.

Nor does it appear that Texas courts would look favorably on such an argument. For instance, in *Coates Energy Trust v. Frost National Bank*, No. 04-11-838-cv, 2012 WL 5984693 (Tex. App.—San Antonio Nov. 28, 2012, pet. denied), Coates, as the holder of a mineral interest, sought to recover unpaid oil and gas proceeds from Frost Bank, which was the lessor under oil and gas leases with the Sanchez Oil & Gas Corporation. Frost claimed that it had adversely possessed Coates's purported interest because it had paid Coates, and Coates had accepted, a smaller share of royalties for the statutory period than the share Coates claimed in the litigation. The court rejected that contention:

> [U]pon entering into the Sanchez leases, Frost's interests changed. . . . [A]s the lessor of the Sanchez leases, Frost retained only a royalty interest. A royalty interest, as distinguished from a mineral interest, is a non-possessory interest. . . . ***As the holder of only a right of reversion and a royalty interest under the Sanchez leases, Frost had no possessory interest of the mineral fee; it therefore could not have asserted the required possession, and certainly not open and hostile possession, over Coates's mineral interest.*** There is no evidence that Frost took actual possession of the minerals by drilling and producing oil and gas. Instead, it conveyed the minerals, by an oil and gas lease, to third party oil and gas companies, holding only a non-possessory royalty interest.

2012 WL 5984693, at *9 (emphasis added, citations omitted).

Here, under the relevant leases, Defendants possess only a royalty interest in the Property with the possibility of reverter. They cannot possess the oil and gas on the property, let alone adversely. Defendants' claim to have extinguished Verde's interest through adverse possession therefore fails.

## F. Statute of Limitations

Defendants next argue that any claim Verde might have possessed is barred by the statute of limitations. They assert, and Verde does not dispute, that the governing statute of limitations falls under Texas Civil Practice & Remedies Code § 16.051. That provision states that "[e]very action for which there is no express limitations period, except an action for recovery of real property, must be brought not later than four years after the day the cause of action accrues." *Id.*

Verde characterizes this case as a "continuing breach" of the obligation to pay royalties, which it contends allows recovery of "'damages from four years prior to the filing of [its] original petition . . . to the date of trial.'" D.E. 64, p. 29 (quoting *Dvorken v. Lone Star Indus., Inc.*, 740 S.W.2d 565, 567 (Tex. App.—Ft. Worth 1987, no writ)). Verde also argues that the discovery rule should apply to toll the statute of limitations in light of Defendants' "continued non-disclosure of the data central to Plaintiffs' claim." *Id.* at 30.

The Court rejects Verde's proposed application of the discovery rule. "The discovery rule provides a 'very limited exception to statutes of limitations.'" *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (quoting *Computer Assocs. Int'l v.*

*Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)). It applies only where "(1) the nature of the injury incurred is inherently undiscoverable; and (2) the evidence of injury is objectively verifiable." *Id.* (citing *Altai*, 918 S.W.2d at 456).

Nothing about Defendants' alleged nonpayment of royalties made it "inherently undiscoverable." As a holder of royalty interests, Verde has "some obligation to exercise reasonable diligence in protecting [its] interests." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 736 (Tex. 2001) (quoting *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998) (internal quotation marks omitted)). The record reflects that memoranda of oil and gas leases were publicly filed in the Live Oak County records as early as 2008, at which point the exercise of reasonable diligence would have alerted Verde, as well as any other similarly-situated holders of interests in the Property, to the need to assert its interests. Verde's alleged injury was not inherently undiscoverable, then, and the discovery rule does not apply. *Wagner & Brown*, 58 S.W.3d at 737 (claim based on underpayment of oil and gas royalties was not inherently undiscoverable); *see also EnerQuest Oil & Gas, LLC v. Plains Expl. & Prod. Co.*, 981 F. Supp. 2d 575, 616 (W.D. Tex. 2013) ("Texas courts have repeatedly rejected application of the discovery rule to claims involving oil and gas operations." (citations omitted)).

The Court agrees with Verde, however, that the statute of limitations does not bar claims accruing within four years of the date it filed its complaint. This conclusion is consistent with those reached by Texas appellate courts in other cases brought by plaintiffs seeking to recover unpaid royalties. *See Lyle*, 365 S.W.3d at 355 ("The statute of limitations here . . . only bars recovery of the royalty payments accruing more than

four years prior to the filing of the suit."); *Dvorken*, 740 S.W.2d at 567 ("If a continuing breach has occurred then appellants would be entitled to damages from four years prior to the filing of their original petition . . . to the date of trial.").

Verde filed this action on November 2, 2016, meaning the relevant period for purposes of the statute began on November 2, 2012. Any claims for unpaid royalties accruing after November 2, 2012, thus are not barred by the statute of limitations.

### G. Laches

Finally, Defendants argue that Verde's claim is barred under the equitable doctrine of laches. This argument also fails.

"Two essential elements of laches are (1) unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because of the delay." *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 80 (Tex. 1989). "As a general rule, laches is inappropriate when the controversy is one to which a statute of limitations applies." *Graves v. Diehl*, 958 S.W.2d 468, 473 (Tex. App.—Houston [14th Dist.] 1997, no pet.).

Defendants claim that "[t]he law required Verde—or its predecessors—to act timely at any point in the last 90 years" and that Verde's failure to do so bars its claim under the doctrine of laches. D.E. 58, p. 47. They have not attempted to show, however, how they detrimentally relied on inaction by Verde or its predecessors. Dismissal based on laches is therefore inappropriate.

For the above reasons, the Court construes the Mattison Deeds as conveying a floating royalty interest.   Defendants' motion for summary judgment is therefore **DENIED** and Verde's motion is **GRANTED IN PART AND DENIED IN PART**.

## MOTION TO AMEND

Verde has also sought leave to amend its complaint under Federal Rule of Civil Procedure 15(a)(2).   In its amended complaint, Verde asks (1) to add Burlington Resources Oil and Gas Company, LP (Burlington) as a defendant, asserting against it a claim arising under the Texas Natural Resources Code (TNRC); (2) to add as additional named plaintiffs other alleged successors to Mattison's grants; and (3) to add a cause of action seeking a declaratory judgment that the Mattison Deeds conveyed either a mineral interest or a royalty interest.   D.E. 67, pp. 1–2.

Under Rule 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires."   The rule thus "'evinces a bias in favor of granting leave to amend,' and '[a] district court must possess a "substantial reason" to deny a request.'"   *SGK Properties, L.L.C. v. U.S. Bank Nat'l Ass'n for Lehman Bros. Small Balance Commercial Mortg. Pass-Through Certificates, Series 2007-3*, 881 F.3d 933, 944 (5th Cir. 2018) (quoting *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004)).   Factors for the Court to consider include: "(1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by previous amendments; (4) undue prejudice to the opposing party; and (5) futility of the amendment."   *Id.* (citation and internal quotation mark omitted).

The Court will permit Verde to file its amended complaint. It is undisputed that Verde filed its motion within the time permitted for amended pleadings under the governing scheduling order, which sets March 1, 2019, as the deadline for Verde's amended pleadings. D.E. 50. Verde also has not previously sought leave to amend. Defendants complain the amendment will be futile, but they do not offer any arguments as regarding futility other than the ones urged in their summary judgment briefing as to why Verde allegedly does not hold any legally enforceable interest.

Defendants also focus on the length of time this matter has been pending, as Verde filed its complaint in November 2016. Defendants note as well the somewhat unusual sequencing of Verde having filed its proposed amendment while summary judgment motions are pending, which Defendants claim is evidence of bad faith and dilatory motives.

Nonetheless, the amendment does not appear to be the product of bad faith or dilatory motive, nor does it appear that Defendants will suffer any undue prejudice as a result of the amendment. Verde's proposed claim against Burlington appears to be a modest addition to the matter.[16] The joinder of new named plaintiffs likely does little to complicate the proceedings, as Verde itself has yet to prove its own chain of title. As for Verde's desire to pursue a declaratory judgment claim, the parties have already extensively addressed the construction of the Mattison Deeds and whether they may be

---

[16] Defendants claim that the rule in issue as regarding Verde's assertion of its TNRC claim against Burlington is Rule 21, which addresses misjoinder and nonjoinder of parties. Because Verde seeks to assert a new claim against a new party, however, the Court considers Rule 15 to be the better fit, although the analysis is similar under either provision. *See* 6 Wright & Miller, § 1474 (noting, among reasons for amended pleadings, "to change the nature or theory of the party's claim" or "to add, substitute, or drop parties to the action"); *see also id.* ("[T]he same basic standard for adding or dropping a party will apply whether the pleader moves under Rule 15(a) or Rule 21.").

characterized as conveying a mineral or royalty interest—the same question as to which Verde seeks a declaratory judgment.[17]

With respect to Verde's sequencing its request for leave to amend after the parties have filed summary judgment motions, the parties asked the Court to entertain their cross-motions for summary judgment before the deadline for amended pleadings. Defendants cannot claim to have been surprised that Plaintiffs would seek leave to amend while summary judgment motions were pending (or afterward). Nor has the request for leave to amend mooted the parties' briefing, as the proposed amendment only clarifies the issues developed at length through the summary judgment briefing.

For the foregoing reasons, the Court **GRANTS** Verde's motion for leave to amend its pleading.

## CONCLUSION

Defendants' motion for summary judgment (D.E. 58) is **DENIED**. Verde's motion for partial summary judgment (D.E. 57) is **GRANTED IN PART AND DENIED IN PART**. Verde's motion for leave to amend (D.E. 67) is **GRANTED**. The Clerk of the Court is ordered to file the First Amended Class Action Complaint for Declaratory and Monetary Relief which was filed as Exhibit 1 to Verde's motion (D.E. 67-1).

ORDERED this 9th day of January, 2019.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

---

[17] In this regard, the Court notes that its prior determination that the Mattison Deeds conveyed floating royalty interests does not necessarily entitle Verde to a declaratory judgment on this claim. As the parties have not addressed the issue, the Court has assumed in this Order that Verde can establish chain of title.